# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANTONIO FELICIANO, | § | |
| | § | No. 344, 2016 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court of the |
| | § | State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1307015825 |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: December 2, 2016
Decided: March 3, 2017

Before **HOLLAND**, **VALIHURA**, and **VAUGHN**, Justices.

## ORDER

This 3rd day of March 2017, upon consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1) The appellant, Antonio Feliciano, filed this appeal from the Superior Court's order of June 24, 2016, denying his first motion for postconviction relief under Superior Court Criminal Rule 61. We conclude there is no merit to the appeal and affirm the Superior Court's judgment.

(2) On April 25, 2014, at the end of a two-day bench trial, the Superior Court convicted Feliciano of Burglary in the Second Degree and Theft. On November 6, 2014, the Superior Court granted the State's amended motion to declare Feliciano a habitual offender and sentenced Feliciano to a total of eight non-

suspended years of Level V incarceration. On direct appeal, this Court affirmed Feliciano's convictions.[1]

(3) On September 21, 2015, Feliciano filed a timely motion for postconviction relief. Feliciano alleged that his trial counsel had been ineffective because counsel (1) did not file a motion to suppress; (2) did not effectively cross-examine the victim; (3) did not subpoena an eyewitness; and (4) was "deliberately indifferent" to Feliciano's mental state at trial and to his known history of mental illness.

(4) Feliciano's postconviction motion was referred to the Trial Judge who presided over the bench trial. At the direction of the Trial Judge, Feliciano's trial counsel filed an affidavit responding to the allegations of ineffective assistance of counsel, and counsel for the State filed a response to the postconviction motion. Once those submissions were filed, the Trial Judge conducted a hearing on the postconviction motion. Also, after the hearing, the Trial Judge ordered that Feliciano undergo a competency evaluation "to provide insight as to [Feliciano's] competency to stand trial and his state of mind during the offense." The psychiatric evaluation was submitted on May 25, 2016.

---

[1] *Feliciano v. State*, 2015 WL 3766442 (Del. June 12, 2015).

2

(5)    By order dated June 24, 2016, the Superior Court denied Feliciano's motion for postconviction relief. This appeal followed.

(6)    On appeal, Feliciano argues that his trial counsel was ineffective for failing to subpoena a witness. Feliciano does not argue his other allegations of ineffective assistance of counsel. Those allegations are deemed to be waived on appeal.[2]

(7)    Having carefully considered the parties' briefs and the Superior Court record, we conclude that the Superior Court's judgment should be affirmed on the basis of the court's order of June 24, 2016.[3] In a thorough and thoughtful decision, the Superior Court analyzed Feliciano's claims and explained why they were without merit. On appeal, the record reveals no indication that Feliciano's trial counsel was deficient or that any alleged error on the part of trial counsel affected the outcome of Feliciano's trial.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

_____
Justice

---

[2] *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993).
[3] A copy of the Superior Court's decision is attached to this Order as Exhibit A.

3

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | ID No. 1307015825 |
| | ) | |
| ANTONIO FELICIANO, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This 24th day of June, 2016, having considered Defendant's Motion for Postconviction Relief, the Affidavit of Trial Counsel, the State's Response, a hearing on the matter, a psychiatric evaluation, and a full, thorough, and careful *de novo* review of the record, Defendant's Motion is DENIED.

It appears that:

1.    On September 21, 2015, Antonio Feliciano (the "Defendant") filed this Motion for Postconviction Relief.

2.    The chronology of the case is set forth as follows:

> On April 25, 2014, after a one day bench trial, the Superior Court found the appellant, Antonio Feliciano, guilty of Burglary in the Second Degree and Theft under $1,500 as a lesser included offense of Theft over $1,500. After granting the State's amended motion to declare Feliciano a habitual under 11 *Del. C.* § 4214(a), the Superior Court sentenced Feliciano to eight years of Level V incarceration for Burglary in the Second Degree and six months of Level V incarceration, suspended for six months of Level II probation, for Theft under $1,500.[1]

---

[1] *Feliciano v. State.* 2015 WL 3766442, at *1 (Del. June 12, 2015) ("Feliciano was also sentenced for convictions arising from his guilty plea in Criminal ID. No. 1401004088").

1

## EXHIBIT A

3. The facts of the case are that on July 19, 3013, Mignon Matthews reported that her home had been burglarized. Ms. Matthews testified that a puppy, a football, an air conditioner, a television, and a check had been stolen.

4. While the police were investigating her burglary, the police received a report from Defendant alleging that Ms. Matthews had stolen his money. Ms. Matthews and Defendant lived in the same neighborhood and knew each other. The police responded to Defendant's house and observed some of Ms. Matthew's stolen property inside Defendant's house.

5. The police obtained a search warrant and recovered the missing check, air conditioner, and football. Defendant's fingerprint was found on the air conditioner. Defendant was subsequently arrested.

6. Defendant told the police that he had gone with others to Ms. Matthews' house earlier in the day to confront her about money that he believed she had taken from his house the prior evening after braiding his hair.

7. Defendant said that he did not enter the residence. Instead, he called out to her, there was no answer, and he saw that her door was open. Defendant explained that the others who were with him began to steal objects from Ms. Matthews' residence.

8. The arresting officer testified at trial and played Defendant's videotaped statement. Ms. Matthews testified and acknowledged that she knew

2

Defendant, had braided his hair, and thought that a person named Bruce Cherry had stolen her belongings.

9. Trial Counsel challenged the value of the stolen items (particularly the puppy), offered an alternative explanation for Defendant's presence at Ms. Matthew's residence (inquiriy into his missing money), and argued that Defendant goes to her house because he was a trusted friend who had helped her with her home, mail, and children.

10. Trial Counsel also called Defendant's son to the witness stand. Antonio Feliciano, Jr. testified that Defendant, earlier that day, had talked with Bruce Cherry and another person about his suspicion that Ms. Matthews had taken his money. Defendant went somewhere with Bruce Cherry and, about an hour later, Defendant returned alone and empty-handed. Ten minutes later, Bruce Cherry drove to Defendant's house, removed an air conditioner and a football from the car, and put it in Defendant's house. Defendant's son also testified that he did not see any dog or a television in Mr. Cherry's car or the Defendant's house.

11. The Court found Defendant guilty of Burglary in the Second Degree and the lesser included offense of Misdemeanor Theft.

12. On November 6, 2014, the Court sentenced Defendant, as an Habitual Offender, to 8 years at Level V (the mandatory minimum) (Burglary) and 6 months at Level V suspended for six months at Level II probation (Theft).

3

13. Defendant appealed his conviction to the Delaware Superior Court which set forth the procedural history of his claims:

> On appeal, Feliciano's trial counsel filed a motion for leave to withdraw. We granted the motion and the Office of the Public Defender entered an appearance on behalf of Feliciano ("Counsel"). Counsel then filed a brief and a motion to withdraw under Supreme Court Rule 26(c) ("Rule 26(c)"). Counsel asserts that, based upon a complete and careful examination of the record, there are no arguably appealable issues. Counsel informed Feliciano of the provisions of Rule 26(c) and provided Feliciano with a copy of the motion to withdraw and the accompanying brief.
>
> Counsel also informed Feliciano of his right to identify any points he wished this Court to consider on appeal. Feliciano has not raised any issues for this Court to consider. Feliciano informed Counsel that he intends to pursue postconviction relief after conclusion of this appeal. The State has responded to the Rule 26(c) brief and moved to affirm the Superior Court's judgment.[2]

14. On June 12, 2015, the Delaware Supreme Court, finding that the appeal lacked merit, affirmed Defendant's conviction.[3]

15. Defendant's instant Motion for Postconviction Relief asserts claims of ineffective assistance of counsel. He argues that Trial Counsel should have stopped the trial due to Defendant's mental state and challenged the evidence.

16. Specifically, Defendant maintains that Trial Counsel was ineffective because Trial Counsel had him waive a suppression hearing even though his "confession" was coerced and "unwanted"; did not "capitalize" on the victim's "confession" that Defendant was allowed to enter her home and hold her mail;

---

[2] *Feliciano v. State*, 2015 WL 3766442 at *1 (Del. June 12, 2015).

[3] *Id.*

4

failed to subpoena eye witnesses; and proceeded with the trial despite allegedly being aware that Defendant's medicine "was affecting [his] ability to think correctly" when he answered the Court's questions.[4]

17.    In support of his Motion, Defendant proffers that because he did not know his exact charges (he thought that they were burglary and conspiracy when, instead, it was burglary and theft) it is proof that he was so medicated that the case should not have gone to trial that day.  He says that he was taking "Sequell [sic], Haldol, and an antidepressant" for his "paranoid schizophrenia, P.T.D.O."

18.    On November 2, 2015, Trial Counsel filed an Affidavit responding to Defendant's claims.

19.    Trial Counsel wrote that a suppression motion would have been "fruitless" because the police searched Defendant's home pursuant to a search warrant.[5]

20.    Trial Counsel also wrote that the victim testified at trial and acknowledged that Defendant had been previously entrusted to hold her mail and keep an eye on her house.  Thus, in view of the fact that this information was made known to the trier of fact, Trial Counsel was not ineffective on this count.

---

[4] Def.'s Mot. for Postconviction Relief at 3-4 (Sept. 21, 2015).

[5] Aff. of James Natalie, Esq., at 1 (Oct. 30, 2015).

21. Concerning the allegation that defense witnesses should have been subpoenaed, Trial Counsel responded that the only available eyewitness (Defendant's son) did appear and testify. Another eyewitness, Bruce Cherry, was incarcerated however his attorney (Ferris Wharton) said that he was unavailable. Lastly, the final eyewitness, Defendant's niece, could not be located.

22. Finally, Trial Counsel noted that Defendant appeared coherent during the trial and was capable of answering questions.[6]

23. On December 14, 2015, the State filed a Response to the Defendant's Motion. The State argued that Defendant's claims are procedurally barred and also without merit.

24. On February 8, 2016, this Court held a hearing on the instant Motion. Defendant represented himself, appeared coherent, responsively answered questions, and acted appropriately. Defendant was aware that he was on medications, was able to tell the Court the names of his current medications (Geodon and Zoloft), and knew that he took Risperdal, Haldol, and Seroquel for twelve years prior to his trial.

25. He acknowledged that his medications actually helped his mental illness because his prescribed drugs lower the voices in his head, make him feel calmer, and make him feel better about himself. He also admitted that his mental

---

[6] Trial Counsel's reference to Defendant's testimony appears to refer to his taped statement that was played at trial.

6

health issues were essentially the same before and after his trial. He said that he was not sure what was happening in the trial because he has memory problems.

26. Moreover, although Defendant claimed that his medication interfered with his ability to understand the trial, Defendant acknowledged that he did not inform the Court, when he had the opportunity, that he did not understand the proceedings or was unprepared to go forward on the day of trial.

27. At the postconviction hearing, the Court reminded Defendant that his Motion was contrary to what he told the Court immediately prior to trial:

> THE COURT: Okay. And before we began the trial, I asked you some questions –
> THE DEFENDANT: Yes.
> THE COURT: – about how you were feeling?
> THE DEFENDANT: Yes.
> THE COURT: And you told me that you understood what was going on.
> THE DEFENDANT: Well, I was just basically trying to, you know – I don't know what I was thinking about but I really wasn't feeling good that day.
> . . .
> THE DEFENDANT: I really – I really don't even remember half the stuff that I was saying. I mean, half the stuff you even told me, I honestly, truly don't remember.[7]

28. Furthermore, Defendant seemingly agreed with Trial Counsel's defense that the crime was committed by someone else. Defendant essentially reiterated that someone else stole Ms. Matthews' property and he implicated his son, Antonio Feliciano, Jr. in the crime.

---

[7] Postconviction Hearing Tr., pp. 5, 15 (Feb. 8, 2016).

7

29. As to his overall mental health and ability to navigate the day-to-day business of ordinary life, Defendant acknowledged that he was able to function despite his mental illness, raise his sons, be a loving single parent, and provide housing for his children:

> THE COURT: Mr. Feliciano, this is your chance.
> THE DEFENDANT: I just want to say that I didn't commit the crime, but I'm taking responsibility because my son had something to do with it. And he confessed to me over the phones and that he ordered Bruce Cherry, Brandy Hawkins, and Tiara Hawkins to go around and because Miss Matthews had took 1,700 of my disability money and money from my – their grandfather, which he had sent for my little kid to go to training camp. But they are a witness and I do have contact with them now because my son – I told my son to get in touch with my sister which is their mother because they're the ones that are responsible for the crime. But I take responsibility. That's why I wrote you a letter and I told you that I take responsibility, because I had found out my son had something to do with it, and he said he was going to write you. And he wrote you a letter stating that he had – he was – he was one of the brains behind it. And I just feel like I was
> THE COURT: Which is contrary to what he testified to in Court, right?
> THE DEFENDANT: Yeah.
> THE COURT: So, he lied in Court?
> THE DEFENDANT: Yeah.
> THE COURT: Okay, go ahead.
> THE DEFENDANT: But I do have contact with the witness now. I mean, my two nieces that was there, but – because I have another niece, and Bruce Cherry had confessed to her that he had sold the dog to a neighbor in the neighborhood. But I was trying to help the police out by telling them what Bruce had told my niece, and she told me that – she told me where the dog was at, but that wasn't to no avail. But I was trying to cooperate with the police and they charged me with everything because they found it in my house where I reside at. But I certainly didn't commit no crime as far as I went over there. I went in there and I seen them and I left, do you know what I'm saying. But it wasn't my responsibility. Bruce was telling me that she owed him money and he was going to get his money one way or the other, and him and my son was together, and that's what happened.
> I took my when I had came home and she wasn't there, I had just left her house. And when I came home, I went straight to my room. And, then, when I woke up, I said I'm going to call the police. And I called the

8

police on them and they came and arrested me for – they came inside my house and they took my statement inside my house. And I told them what happened to me, and they was looking around and they said okay, just come downtown with me and give me a statement. And the next thing I know, I was charged with burglary and all this. I didn't even see the air conditioner or anything else that was in my house, but I knew I had her mail on my bed because that's when I found out her full name because we called her Mamie (PH.) in the neighborhood and I took her mail when I did go over there because I didn't want nothing to happen to her mail because I know she was on Section Eight and she was, like, she needed all – she needed – she needed all her things, so . . . But I was trying to be a good citizen but it backfired, I guess.

THE COURT: Okay.

(Brief pause).

THE COURT: Okay. The football or something was found in your house, right?

THE WITNESS: Yes.

THE COURT: Who was living in your house with you?

THE DEFENDANT: Well, I got three sons aged 15 to 16 and my 22-year-old son, and I had boarder in there from Philadelphia whose name was Darryl. His name was Darryl and I forgot his last name. But it was four of us that was living in the house – no, five, five, all together, there was my three sons and the boarder and me.

THE COURT: Okay. Was the house leased to you or did you own the house or – I'm sorry.

THE DEFENDANT: No, it's leased.

THE COURT: It's leased to you?

THE DEFENDANT: Yes.

THE COURT: Okay. And I believe that – I think in your statement to the police, you mentioned something about the boys' mother has passed?

THE DEFENDANT: Yes.

THE COURT: And you were a single parent at the time?

THE DEFENDANT: Yes, ma'am.[N]

30.     At the hearing, Trial Counsel, who has known Defendant for 25 years, stated that "Antonio is Antonio." He went on to explain that Defendant, despite having a mental illness, has always been capable of communicating with him. Trial Counsel added that, based on his long-standing history with Defendant, he

---

[N] Postconviction Hearing Tr., p. 34-37.

9

made the Court aware of Defendant's mental illness prior to trial so that the Court could thoroughly question Defendant as to Defendant's ability to participate in the trial.

31.     Additionally, the Court read portions of the pre-trial colloquy to Defendant during the hearing. The sections that were read reflected that Defendant appeared to understand the proceedings on his trial day:

> THE COURT: All right. Mr. Feliciano?
> THE DEFENDANT: Yes.
> THE COURT: My name is Judge Streett, okay. You are here today because you have been charged with two charges, Burglary Second Degree and Theft Over $1,500. And today is your day for trial. Do you understand that?
> THE DEFENDANT: Yes.
> THE COURT: Okay. And your attorney is Mr. Natalie; is that correct?
> THE DEFENDANT: Yes.
> THE COURT: Okay. Do you understand what is going on today?
> THE DEFENDANT: Yes.
> THE COURT: Do you understand what a trial is?
> THE DEFENDANT: Yes.
> THE COURT: Have you ever faced a trial before?
> THE DEFENDANT: No.
> THE COURT: Okay. But you have had some criminal contacts before?
> THE DEFENDANT: Yes.
> THE COURT: So you have some familiarity with the criminal justice system; is that right?
> THE DEFENDANT: Yes.
> THE COURT: All right. Okay. Now, your attorney says that you're on Haldol and that you take an antidepressant at nighttime?
> THE DEFENDANT: Yes.
> THE COURT: How do those affect your ability to understand what's going on in the courtroom?
> THE DEFENDANT: It's it seem like everything is clear.
> THE COURT: Everything is clear?
> THE DEFENDANT: Yes.
> THE COURT: So are you telling me that the Haldol helps you understand what's going on?

10

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. Are you telling me that the antidepressant helps you control your mood?

THE DEFENDANT: Yes, ma'am.

THE COURT: And so do you feel that you understand what is going on today?

THE DEFENDANT: Yes, ma'am.

THE COURT: And you feel that your mood is stable enough so you can continue with today's proceedings?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. Now, do you understand what the charges are?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. Tell me what the charges are?

THE DEFENDANT: Burglary and 1500.

MR. NATALIE: Theft over 1500.

THE DEFENDANT: Theft Over 1500 and Conspiracy.

MR. NATALIE: Actually, there is no Conspiracy charge.

THE COURT: It's just the two charges now. Okay. And do you understand that those are felonies?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. And do you understand that you could face significant time?

THE DEFENDANT: Yes, ma'am.

THE COURT: In jail. And I see on the paperwork that you have a criminal record, in fact the State might even ask that the Court declare you to be a habitual offender. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Which means you could get up to life in prison. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. Now, the next thing is your attorney says that you and he have talked about whether to have a jury trial, whether to have a bench trial?

THE DEFENDANT: Yes.

THE COURT: Is that correct?

THE DEFENDANT: Yes.

THE COURT: Have you had enough time to discuss those options with your attorney?

THE DEFENDANT: Yes.

THE COURT: Okay. And do you understand what the difference is?

THE DEFENDANT: Yes.

THE COURT: Okay. The difference would be if you had a jury there would be twelve people.

THE DEFENDANT: Right.

11

THE COURT: Who would listen to the evidence and then they would vote on the guilt or innocence.

THE DEFENDANT: Yes.

THE COURT: If it's a nonjury trial, if it's a bench trial, the Judge will listen to the evidence and make a decision on that. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. And he says that you want to have a bench trial, is that correct?

THE DEFENDANT: Yes.

THE COURT: Okay. Whose decision was that? Whose choice is that, his or yours?

THE DEFENDANT: It was his and then he was telling me the difference. He told me the difference.

THE COURT: Okay.

THE DEFENDANT: Between –

MR. NATALIE: And then I asked him to decide whether he wanted a jury or a judge. He said a judge.

THE COURT: So in the end, whose makes this final decision on this?

THE DEFENDANT: I guess I do.

THE COURT: Okay. And did you make the final decision on this?

THE DEFENDANT: Yes.

THE COURT: Okay. Are you ready to begin trial now?

THE DEFENDANT: Yes.

THE COURT: Okay.

MR. NATALIE: He's shaking his head no because he probably would elect never to go to trial, but, yes, he's ready for trial.

THE COURT: Okay. Today is the day for trial. Okay. And have you had other times when you talked to Mr. Natalie about this case and about the charges?

THE DEFENDANT: Yes.

THE COURT: And about any possible defenses to the case?

THE DEFENDANT: Yes.

THE COURT: Okay. And have you had occasions where you have talked to Mr. Natalie in terms of this trial – these charges about the consequences of taking plea as opposed to the consequences of going to trial?

THE DEFENDANT: Yes.

THE COURT: All right. I'm satisfied. Mr. Axelrod, is there anything else that you want to inquire about as to either one of the issues? If you do, now's the time to talk.

MR. AXELROD: As to the second, just to make it abundantly clear in him electing to proceed to a bench trial, he fully understands that he is waiving the right to have 12 individuals come to a unanimous

12

decision to decide his case and instead he's putting his trust in the judicial fact-finding of one person, which is Your Honor.

THE COURT: Do you understand what he said, Mr. Feliciano?

THE DEFENDANT: Yes.

THE COURT: Okay. And do you agree with that; do you understand that?

THE DEFENDANT: Yes.[9]

32. Trial Counsel also expanded upon his Affidavit. Specifically, Trial Counsel explained that a motion to suppress the search warrant would have been unavailing, he felt that Defendant appeared to be his usual self when he agreed to give a statement to the police, and he discussed Defendant's typed statements with Defendant.

33. Additionally, Trial Counsel stated that Defendant had assisted in his defense and had participated in the trial. As an example, Defendant had suggested that two witnesses be subpoenaed for trial. Accordingly, Trial Counsel followed through on Defendant's request, however, one witness (Defendant's niece) could not be located and the attorney for the other requested witness, Bruce Cherry, asserted Mr. Cherry's Fifth Amendment right against self-incrimination and refused to allow Mr. Cherry to testify. Moreover, Trial Counsel said that this was explained to Defendant prior to trial.

34. Trial Counsel also told the Court that he effectively elicited favorable testimony from the State's witness (Ms. Matthews). Furthermore, he believed, on cross-examination, that Defendant's strategy to proceed by way of a bench trial

---

[9] Trial Tr. at 17-24 (Apr. 24, 2014).

actually helped Defendant because Trial Counsel was allowed to broadly cross examine Ms. Matthews and her testimony (that she is friends with Defendant and blamed Mr. Cherry) aided the Defendant. The trial record reflects:

CROSS-EXAMINATION BY MR. NATALIE:

Q. Okay. How long had you been braiding his hair?

A. For a while.

Q. Okay. You had to have known him long enough –

A. Mm-hmm.

Q. – to trust him with your house?

A. Right.

Q. Okay. And did you trust him with your house?

A. Yes.

Q. And you trusted him with your children?

A. Yes.

Q. But you thought, no the day that your house was – where people broke into your house and took your property, you suggested to the police that Mr. Feliciano might have done that?

A. No. I did tell the police that we had a conversation about money, but I never accused him of doing anything.

Q. Okay. All right. Do you have some idea now who took your property?

A. Yes.

Q. And who would that be?

A. Bruce Cherry.

Q. Do you know him?

A. I – he lives around the development. I have seen him.

MR. AXELROD: Your Honor, I'm going to object to this line of questioning because it is speculation and hearsay.

MR. NATALIE: She knows Bruce Cherry, he lives in the neighborhood. We have established –

THE COURT: That question is –

MR. NATALIE: I'm sorry.

THE COURT: That question is fine. But if you have additional questions

MR. NATALIE: I didn't, frankly.

THE COURT: All right. Well then move on.

MR. NATALIE: I honestly didn't. She's established that she believes it was Bruch Cherry and he lives in the neighborhood.

BY MR. NATALIE:

Q. You haven't seen Mr. Cherry recently, have you?

A. No.

Q. Do you know where he is by any chance?

A. He's in jail for molesting a child.

Q. All right.

MR. AXELROD: Your Honor, if the last part of that answer could be stricken as nonresponsive.

MR. NATALIE: I – it doesn't matter to me.

THE COURT: Strike it.

MR. NATALIE: We're here for a bench trial, Your Honor.

BY MR. NATALIE:

Q. Since the day your property was stolen, have you had conversations with the defendant, Mr. Feliciano?

A. Yes.

Q. Okay. Are you friends again?

A. Yes.

Q. Okay. He doesn't need to have his hair braided, I guess, right now?

A. No.

Q. It's not long. Have you been in his house since that day in July, last year?

A. Yes.

Q. And has he been in your house since that date?

A. Yes.

Q. Okay. Has he made efforts that you know about to recover your property, including your puppy?

A. Yes.

Q. All right.

MR. NATALIE: No further questions, Your Honor.

THE COURT: All right. Thank you.

REDIRECT EXAMINATION BY MR. AXELROD:

Q. When you spoke about that you believe Bruce Cherry took your items, you testified that you didn't see who took them; right?

A. Yes.

Q. And you haven't recovered them; right?

A. No.

Q. So you don't actually know one way or the other who took them, right, that's your testimony?

A. He bragged about it.

Q. That wasn't the question. You didn't actually know one way or the other?

A. No, I wasn't there.[10]

---

[10] Trial Tr. at 86-90.

35.   After the post-conviction motion hearing, based on Defendant's allegation of mental incompetency, the Court ordered that a competency examination be performed.

36.   On May 20, 2016 a psychiatrist issued a report and determined that Defendant, although mentally ill, had been competent for trial.

37.   Before considering the merits of any claims asserted in a motion for postconviction relief, the Court must first determine if the motion is procedurally barred under Superior Court Criminal Rule 61.[11]

38.   Defendant's motion is timely, having been filed within one year after his judgment of conviction became final, is not repetitive, and was not previously adjudicated.  There are no procedural bars to Defendant's Motion.

---

[11] Superior Court Criminal Rule 61(i) provides, in pertinent part:
Bars to relief.

(1) Time limitation. A motion for postconviction relief may not be filed more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court.

. . . .

(3) Procedural Default. Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows

(A) Cause for relief from the procedural default and
(B) Prejudice from violation of the movant's rights

. . . .

(5) Bars inapplicable. The bars to relief in paragraphs (1), (2), and (3), of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a claim that satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule.

39. However, in the instant case, an analysis of the law concerning attorney performance leads to the conclusion that Defendant's Trial Counsel did not fall below normal standards.

40. In order for a defendant to establish ineffective assistance of counsel, the defendant must do more than simply claim that his counsel was ineffective. The defendant must show that counsel's alleged "errors were so grievous that his performance fell below an objective standard of reasonableness . . . [and] there is a reasonable degree of probability that but for counsel's unprofessional errors the outcome of the proceedings would have been different."[12]

41. The law is clear that there is a strong presumption that counsel's representation is competent and falls within the "wide range" of reasonable professional assistance.[13] Moreover, deference must be given to counsel's judgment in order to promote stability in the trial process.[14]

42. Furthermore, to overcome the strong presumption that counsel has acted competently, the defendant must demonstrate that "counsel failed to act reasonabl[y] considering all the circumstances" and that the allegedly unreasonable

---

[12] *State v. Gattis*, 1995 WL 790961, at *4 (Del. Super Ct. Dec. 28, 1995) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)). *See also Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Premo v. Moore*, 562 U.S. 115, 121 (2011); *Scott v. State*, 7 A.3d 471, 475-76 (Del. 2010); *Duross v. State*, 494 A.2d 1265, 1268 (Del. 1985).

[13] *Premo v. Moore*, 562 U.S. at 121.

[14] *Id.* at 125.

17

performance prejudiced the defense.[15] The issue is not whether counsel deviated from the best or most common practice but whether counsel's representation was inadequate under the "prevailing professional norms."[16] Thus, the essential question is whether counsel made mistakes so crucial that counsel was not functioning at the level guaranteed by the Sixth Amendment and deprived Defendant of a fair trial.[17]

43.     In order to show prejudice, Defendant must prove that, but for counsel's errors, the result would have been different.[18] The Court does not need to be certain that counsel's performance had no effect on the outcome.[19] However, there must be a substantial probability that there would have been a different result.[20] The test calls for the defendant to "make specific and concrete allegations of actual prejudice and substantiate them."[21]

44.     In the instant case, Defendant alleged that his Trial Counsel should not have allowed the trial to take place because Defendant took medication for his

[15] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks omitted) (quoting *Strickland v. Washington*, 466 U.S. at 688).

[16] *Harrington v. Richter*, 562 U.S. at 105.

[17] *Id.* at 104.

[18] *Cullen v. Pinholster*, 563 U.S. at 189.

[19] *Harrington v. Richter*, 562 U.S. at 111.

[20] *Id.* at 112.

[21] *Scott v. State*, 7 A.3d 471, 476 (Del. Oct. 29, 2010).

18

mental illness which rendered him unable to understand the proceedings or participate in his defense. Defendant also criticizes Trial Counsel's preparation because Trial Counsel allegedly did not challenge the State's case, file a suppression motion, highlight Defendant's relationship to the victim, or subpoena witnesses. However, Defendant has failed to show that Trial Counsel was ineffective.

45. The record reflects that Trial Counsel believed that Defendant (whom he has known for more than 25 years) was capable of participating in his defense. The record also shows that Trial Counsel had considered and rejected the efficacy of a suppression motion, had discussions with Defendant about Trial strategy and witness availability, and effectively cross-examined the victim resulting in the Court convicting Defendant of misdemeanor theft instead of the indicted charge of felony theft. The Court does not find that Trial Counsel was ineffective.

46. Moreover, as to Defendant's claim of incompetency, a post-trial psychiatric examination found that Defendant had been competent during trial. Although Defendant has a psychiatric diagnosis of schizophrenia, the psychiatrist found that Defendant "possessed an intact understanding of the legal charges against him. . . the plea available to him, the plea bargaining proven, the weight of the evidence against him and the potential outcome of his case."[22]

---

[22] Forensic Psychiatric Evaluation Report, May 6, 2016, p. 8.

47.    Furthermore, the psychiatric evaluation also found, "to a measurable degree of medical certainty, that the defendant would not qualify for a not guilty by reason of insanity or a guilty but mentally ill finding" because Defendant's actions and description of events do not suggest that they were "substantially affected by a mental illness at the time of the offense".[23]

48.    Additionally, the Court had the benefit of assessing Defendant's awareness immediately prior to trial and during trial. The pretrial colloquy shows that Defendant was lucid, logical, and able to participate in the trial proceedings:

> THE COURT: Are we ready for trial?
>
> MR. NATALIE: We are, Your Honor. There are two preliminary matters, I assume the Court would like to address Mr. Feliciano with respect to his waiver of jury trial. And I would also like to alert the Court to some – a matter that might effect [sic] his ability to go to trial at all.
>
> When I was discussion his right to waive jury trial, he was having difficulty focusing on what I was saying. And I said, Antonio, are you on your meds? He is. He is diagnosed paranoid schizophrenic. That diagnosis was rendered May 23, 2012 by the State's own Chief Psychiatrist at the Delaware Psychiatric Center as a result of a court-ordered evaluation. He takes Haldol for – which is an antipsychotic medication two times a day.
>
> His son is here with him today and acknowledged he took his meds this morning, so I believe – and the son said this is what happens to him when he takes those medications.
>
> THE COURT: Well, he takes it everyday, you said?
>
> MR. NATALIE: That's right. He has to take it everyday; in fact, he takes it twice a day and he also takes an antidepressant at night so he can sleep.
>
> I believe he will be able to respond to Your Honor's question. At least I hope he is, but I'm alerting the Court to the difficulty that I had initially.
>
> Now, when I finally determined that he was on his medication and that this is the way he is whenever he's on his medication – and I certainly don't want him off his medication that's where we are. He goes to

---

[23] *Id.*

treatment everyday, Your Honor, at the VA hospital in Elsemere, that's all part of the regimen that was established in 2012 by Judge Jurden.

THE COURT: All right. So, from what I'm hearing you say, he's on these medications and it looks as though he's continue [sic] on these medications, so it's not as though this is a short term situation. And that on another day he would be any better to understand what's going on at trial, so that's the first thing.

So today is probably –

MR. AXELROD: As good a day as any. I just wanted to alert the Court to that.

THE COURT: Now, having been made aware of his diagnosis and the medications he's on, have you been able to have lucid conversations with him today?

MR. NATALIE: I believe I have, Your Honor. I believe he does understand what he's doing. I explained the function of a jury versus a bench trial. He understands that.

I told him that he had an absolute right to have a jury of 12 decide his fate. I have suggested to him that he ought to waive that, which – because it will make things a lot simpler and we can talk about things that we can't talk about in front of a jury. And he understands hat.

I have known Mr. Feliciano, Your Honor, for 25 years. Occasionally, he gets me to represent him and I try to do my best. And he understands that.

THE COURT: Well, you bought [sic] up a point, you have known him for 25 years, how is his condition today in relation to 25 years you have known him?

MR. NATALIE: A lot has happened in the interim including some period in the service, Your Honor. He's a disabled veteran, so a lot has happened to him. He's not the same person I knew 25 years ago, that's for sure.

THE COURT: Well, none of us are.

MR. AXELROD: No.

THE COURT: But in terms of –

MR. AXELROD: He'd like to be that guy again.

THE COURT: But in terms of his mental state and in terms of his ability to understand.

MR. AXELROD: The mental state, Your Honor, is as a result of PTSD and a whole lot of other things.

THE COURT: But how is it in relation to what it used to be?

MR. NATALIE: Well, I can still deal with Antonio. I believe, as I said, he understands what he's doing today.

THE COURT: Well, the point is you had a baseline for him before and he has changed and he has now been diagnosed with problems. And in view of the fact you have known him in the past and you understood what his baseline was in terms of his mental capacity and now the way he is today, do you feel he can still go forward with a trial?

21

MR. NATALIE: I do.

THE COURT: Okay. Is there anything that the State wants to ask or inquire about in relation to this issue about Mr. Feliciano's mental abilities today?

MR. NATALIE: Your Honor, I think perhaps some direct questions to the defendant, just regarding his situational awareness and that he wants to proceed under the circumstances.[24]

49. Based on Trial Counsel's thoroughness which prompted the Defendant's colloquy with the Court, the Court was able to make a determination that Defendant was able to understand the proceeding and go forward with trial:

I find that based on what Mr. Natalie has told me, your attorney, and my conversation with you, Mr. Feliciano. I find that you are aware of what is going on today, you understand the process, you understand what you're facing. You are able to communicate with your attorney and that you feel that you are prepared for trial and that we can go forward.

As to the waiver of a jury trial, giving up your right to a jury trial, I'm also satisfied that you understand the difference between a jury trial and a nonjury trial. You have talked to your attorney about this. You have talked to your attorney in terms of weighing the benefits and disadvantages of each, and that is your decision, after talking to the attorney and understanding the benefits and disadvantages of these that it's your decision to waive a jury trial. So there's a stipulation as to the waiver of a jury trial and I will sign the stipulation.[25]

50. The record does not suggest that Defendant lacked the ability to participate in his trial. The standard for competency is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual

---

[24] Trial Tr. at 13-17.

[25] *Id.* at 25.

22

understanding of the proceedings against him"[26] and whether he possess the ability to "assist in preparing his defense."[27]

51. Competency is a legal concept, not a medical concept.[28] It is a "fact-specific inquiry that takes into account the totality of the circumstances and does not necessarily turn upon the existence or nonexistence of any one factor."[29] Additionally, the trial judge makes the sole determination of competency for trial.[30]

52. Moreover, legal competency is not an exacting standard.[31] This Court has held:

> Due process requires that the defendant be afforded a fair, not a perfect trial, and that he be able to consult with his lawyer with a reasonable, not a perfect degree of rational understanding. The fact that defendant may suffer from some level of mental disturbance does not mean he is incompetent in the legal sense.[32]

53. Furthermore:

> Competency is, to some extent, a relative matter arrived at by taking into account the average level of ability of criminal defendants. We

---

[26] State v. Williamson, 2013 WL 268981, at *2 (Del. Super. Ct. Jan. 23, 2013), citing Dusky v. United States, 362 U.S. 402 (1960).

[27] Id., citing Drope v. Missouri, 420 U.S. 162, 171 (1975).

[28] Harris v. State, 1996 WL 769482, at *7 (Del. Super. Ct. Dec. 10, 1996).

[29] See also State v. Shields, 593 A.2d 986 (Del. Super. Ct. 1990) (citing Dusky v. United States, 362 U.S. 402); State v. Reed, 2004 WL 2828043 (Del. Super. Ct. Apr. 21, 2004).

[30] State v. Williamson, 2013 WL 268981 at *2.

[31] See State v. Shields, 593 A.2d at 1012.

[32] State v. Wynn, 490 A.2d 605, 610 (Del. Super. Ct. 1985).

23

cannot, however, exclude from trial all persons who lack the intelligence or legal sophistication to participate actively in their own defense. That is not the standard by which we measure competency. Should we do so, we would preclude the trial of a number of people who are, indeed, competent to stand trial as understood in the law. The accused need not understand every legal nuance in order to be competent.[33]

54. The *McGarry* factors, "known as the Competency to Stand Trial Instrument,"[34] is a "widely used assessment procedure in the area of competency to stand trial". The factors are:

- Ability to appraise the legal defenses available,
- Ability to plan a legal strategy,
- Level of manageable behavior,
- Quality of relating to his attorneys,
- Ability to appraise participants in a courtroom,
- Understanding of court procedure,
- Appreciation of the range and nature of the penalties,
- Ability to appraise the evidence and likely outcome,
- Capacity to disclose to his attorneys available pertinent facts surrounding the offense,
- Capacity to challenge prosecution witnesses realistically,
- Capacity to present relevant testimony, and
- Motivation for a positive outcome.

55. The record supports that Mr. Feliciano was aware of his surroundings, grasped the seriousness of the charges, and assisted his attorney. Defendant was prepared for trial, Defendant understood it was his day for trial, Defendant knew who his attorney was, understood what was happening, understood what a trial was, said he was on medication but that it made him clear-headed and helped his

---

[33] *State v. Shields*, 593 A.2d at 1012. *See also State v. Guatney*, 299 N.W. 2d 538 (Neb. 1980):

[34] *State v. Williamson*, 2013 WL 268981 at *3 n. 8 (quoting *State v. Shields*, 593 A.2d. at 1000 n. 23.

understanding, said that his mood was stable enough to go to trial, that he understood that the charges were felonies, and that he could be declared a habitual offender and receive a life sentence.[35] Additionally, Trial Counsel, who knew Defendant for 25 years, believed that the Defendant understood everything.

56. The law is clear that if a defendant "Possesses the mental capacity to appreciate his presence in relation to time, place and things, . . . grasps that he has been charged with serious crimes, . . . knows that he can be sentenced to life if convicted, . . . and is sufficiently coherent to provide his attorney with information necessary or relevant to construct a defense",[36] then the defendant is competent to stand trial.

57. Based on the totality of circumstances, Defendant was competent to stand trial although impaired. Additionally, the Court does not find that Trial Counsel provided ineffective assistance. Accordingly, Defendant's Motion for Postconviction Relief is DENIED.

**IT IS SO ORDERED.**

_____
Diane Clarke Streett, Judge

---

[35] *Id.* at 13 (citing Trial Tr. at 17, 18, 19, 20-21).

[36] *State v. Shields, Id.* at 1013.

25

Original to Prothonotary

cc: Barzilai K. Axelrod, Esquire, Deputy Attorney General
    James A. Natalie, Jr., Esquire
    Antonio S. Feliciano, *pro se*
    ISO